{¶ 18} On this appeal from a judgment of conviction entered by Judge Jose A. Villanueva, I respectfully dissent and would vacate Brian Bezak's conviction on charges of obstruction of justice[3] and remand CR-435254 for correction of the sentencing journal entry.
 {¶ 19} The record reflects that Michael "Dino" Viccaro had lived in the apartment at 3032 W. 105th Street for several months until, in either November or December of 2002, he informed the landlord he was unable to pay the rent and would be leaving. The landlord was a friend, and he allowed Viccaro to store some of his belongings in the back room of the apartment, which he then sublet to Bezak's father, Jack, who also approved of this storage. Viccaro had known the Bezak family from the neighborhood and Jack Bezak, not Brian Bezak, had apparently permitted him to sporadically stay at the apartment while looking for other housing. Bezak and his girlfriend, Emily Kerrigan, did not move into the apartment until approximately December or January, or in other words, after Viccaro had moved out the majority of his belongings.
 {¶ 20} Bezak has consistently maintained that he was not familiar with the name "Michael Viccaro" or "Mike" and that he only knew the person that was in the process of moving out of the apartment as "Dino," and the State has failed to prove otherwise. Viccaro's own testimony supported Bezak's contention by stating that his full name was Michael Dino Viccaro, but that the residents only knew him as Dino.
 {¶ 21} Although Viccaro admittedly kept some belongings in the back room of the apartment and slept there on many occasions, including the night before his arrest,[4] the record contains no indication that Bezak knew him by his full name, and while there are several references to a photograph that Bezak was shown prior to the search, it was not introduced into evidence.
 {¶ 22} The State claims that, when Bezak was asked if he knew a "Michael Viccaro" or "Mike" and was shown a photograph, he responded that he did not and, by doing so, he knowingly communicated false information in an effort to harbor or aid Viccaro. This claim fails for two reasons: (1) the State has failed to prove that Brian Bezak knew Viccaro as anything other than "Dino," and (2) the State has failed to provide sufficient proof that Brian Bezak was shown a recent photograph of Viccaro and that he nonetheless denied knowledge of this person.
 {¶ 23} The majority cites to State v. Bailey,[5]
where the Ohio Supreme Court held that making unsworn, false oral statements to a law enforcement officer with the purpose to hinder the officer's investigation of a crime constitutes conduct punishable within the meaning of R.C. 2921.32(A)(5). In the instant case, however, the State failed to show that Bezak acted with the purpose to hinder the officers' investigation in apprehending Viccaro.
 {¶ 24} "Purpose" is defined as a specific intention to cause a certain result.[6] To be found guilty of obstructing justice, therefore, the State had to prove that Bezak acted with the specific intention of hindering the discovery or apprehension of Viccaro, regardless of the veracity of his statements.
 {¶ 25} Officer Schwarm testified that he had no specific recollection of showing Bezak a photo of Viccaro and noted that, although he wrote a report of the arrest, he did not include any photographs used during the execution of the arrest warrant. Moreover, he testified that nothing Bezak did hindered discovery of Viccaro. When questioned about when the photograph was actually shown to Bezak, Officer Schwarm stated that Bezak and his girlfriend were not immediately shown Viccaro's photograph after being questioned, and when he was asked for specifics regarding the viewing of the photograph, the following exchange took place:
{¶ 26} "A. I can't recall a time where I've searched a housewhere we haven't shown a picture.
 {¶ 27} So you are testifying based on your general mode ofoperation?
 {¶ 28} That's correct.
 {¶ 29} You have no specific recollection in this case ofhaving shown any photograph; isn't that correct?
 {¶ 30} I'm not a hundred percent sure.
 {¶ 31} And it doesn't appear in your report.
 {¶ 32} No."
 {¶ 33} Officer Tim Clark of the Cleveland Police Fugitive Unit was the only State witness to testify that Bezak was shown a photograph, yet he could not attest to the condition of the photograph or the subject's appearance. Although Kerrigan stated that she was shown a photograph, she testified that the photograph she examined for approximately sixty seconds was "fuzzy" and that of a bald man, and the man she knew as Dino had a full head of hair. Kerrigan testified that she knew that Dino occasionally slept in the apartment, but neither she nor Bezak were questioned about other occupants and were under no obligation to disclose that information.
 {¶ 34} Another of the State's witnesses, U.S. Marshall Andrew Deserto, testified that he only assisted in the search and asked Bezak no direct questions. He could not recall Bezak's responses to questions regarding his knowledge of Michael Viccaro or his response when allegedly shown a photograph, only recalling that there was a significant amount of confusion.
 {¶ 35} Further, the State's fourth witness, Cleveland Police Department Detective Andrew Ezzo, testified that he had no contact with Brian Bezak, but remained outside the apartment the entire time and ultimately arrested Viccaro.
 {¶ 36} Testimony throughout the trial alternated between claims that: (1) Bezak was not shown a photograph, (2) he failed to answer after seeing a photograph, (3) when asked if he knew Michael Viccaro, Bezak was unclear on whether he knew him or not, or (4) he was shown a photograph that may or may not have been a former prison photo, which may or may not have shown Viccaro with a bald head.
 {¶ 37} The majority assigns great weight to the phone bill found in the apartment and the photograph of Mary Ann Viccaro's tombstone in the back family room, however, such weight is misplaced, as no one disputed that the artifacts belonged to "Dino." Officer Schwarm testified that, contrary to Detective Clark's testimony, he personally found a phone bill addressed to Michael Viccaro on a table in the back room of the apartment, with a billing date of December 2002, presumably the month he had moved out of the apartment. The phone bill was found in the same room with Viccaro's other belongings, however, there was never a dispute that Dino had stored some of his belongings in the back room of the apartment. The only dispute centered around Brian Bezak's knowledge of the proper legal name of the person storing his belongings in the apartment, and the State has failed to provide sufficient evidence to prove that he had such knowledge and, nonetheless, knowingly communicated false information to the officers.
 {¶ 38} Therefore, I cannot say that "the evidence is legally sufficient to support the jury verdict as a matter of law,"[7] and would sustain Bezak's sole assignment of error.
 {¶ 39} I also note that the judge failed to advise Bezak during the sentencing hearing that post-release control may be part of his sentences, of sanctions that could be imposed if he violated any terms or conditions of such control, or of his driver's license suspension; yet, language imposing such sentences appear on the two journal entries.[8] Reference in the sentencing journal is insufficient to qualify as notification to an offender of post-release control or other provisions of a sentence.[9] I would remand CR-435254 for a journal entry that correctly reflects what was pronounced at the sentencing hearing. I would vacate the conviction in CR-434460, or at the very least correct that sentencing journal entry.
[3] CR-434460.
[4] Tr. at 495.
[5] (1994), 71 Ohio St.3d 443, 644 N.E.2d 314.
[6] R.C. 2901.22(A).
[7] State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
[8] Despite the fact that post-release control for up to three years for felonies of the fifth degree is within the discretion of the parole authority, the journal entries contain the boilerplate language used so often by the judges of the common please court: "Post release control is a part of this prison sentence for the maximum period allowed for the above felony(s) under R.C. 2967.28."
[9] See State v. Stell (May 16, 2002), Cuyahoga App. No. 79850; State v. Dunaway (Sept. 13, 2001), Cuyahoga App. No. 78007; State v. Finger (January 29, 2003), Cuyahoga App. No. 80691, 2003-Ohio-402.